Robert W. PARKER et al., Plaintiffs,

v.

UNITED STATES of America, Clifford Hardin, individually and as Secretary of Agriculture of the United States, Edward P. Cliff, individually and as Chief, United States Forest Service, David S. Nordwall, individually and as Regional Forester, James O. Folkestad, individually and as Supervisor, White River National Forest, United States Department of Agriculture and Kaibab Industries, an Arizona Corporation, Defendants.

Civ. A. No. C–1368.

United States District Court,
D. Colorado.

Feb. 27, 1970.

H. Anthony Ruckel, Richard D. Lamm, Tom W. Lamm, William A. Hillhouse, II, Roger P. Hansen, James R. Wade, Denver, Colo., Lawrence B. Robinson, Donald M. Carmichael, Associate Professor of Law, Boulder, Colo., for plaintiffs.

Dawson, Nagel, Sherman & Howard, by W. David Pantle, Denver, Colo., by special appearance for plaintiff Colorado Magazine, Inc.

James L. Treece, U. S. Atty., James R. Richards, Asst. U. S. Atty., Denver, Colo., by Nelson H. Grubbe, Atty., U. S. Dept. of Justice, Washington, D. C., for defendants.

Holme Roberts & Owen, by Donald C. McKinlay, Denver, Colo., Jennings, Strouss, Salmon & Trask, by Thomas J. Trimble, Phoenix, Ariz., for defendant Kaibab Industries.

John H. Tippit, Denver, Colo., Davies, Biggs, Strayer, Stoel & Boley, by James P. Rogers, Portland, Or., for intervenor Western Wood Products Association.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

This is a suit in which the plaintiffs seek to enjoin the defendants Secretary of Agriculture and the United States Forest Service from selling to the defendant Kaibab Industries 4.3 million board feet of Englemann Spruce, Lodgepole Pine and fir, which the defendant Kaibab proposes to cut and purchase from the United States. The sale area is in East Meadow Creek, which is part of the White River National Forest near Vail, Colorado. The plaintiffs are either residents and property owners at Vail, Colorado, or conservation organizations. The plaintiffs assert that the East Meadow Creek area within which the Forest Service and Kaibab Industries propose to harvest the 4.3 million board feet of Englemann Spruce, Lodgepole Pine and fir is of such character as to qualify as wilderness under the 1964 Wilderness Act, 16 U.S.C. § 1131 et seq. Plaintiffs further allege that the decision of the defendants to sell the timber violates the letter and the spirit of the Wilderness Act together with the Forest Service's own regulations.

In essence the claim is that East Meadow Creek, which includes the proposed sale area, is contiguous to the Gore Range-Eagles Nest Primitive Region and that its character is substantially wilderness. Plaintiffs further assert that the defendants have not studied the area; that the Act and Forest Service regulations contemplate that there shall be a study; that the President and Congress shall have an opportunity to consider a contiguous area of the character of the present one for inclusion in an existing wilderness or primitive area; that the sale of the 4.3

million board feet plus the building of the necessary access roads and the harvesting and removal of the timber would irreparably destroy the wilderness character of this area.

This cause has been before the Court on the defendants' motion for summary judgment, 307 F.Supp. 685. This motion was denied and on that occasion we held that

1. There was jurisdiction over the subject matter;

2. Plaintiffs have standing to bring the suit;

3. The doctrine of sovereign immunity does not bar the action;

4. Plaintiffs should have an opportunity to present evidence as to the wilderness qualities of East Meadow Creek and their ecological interrelationship with the contiguous Gore Range-Eagles Nest Primitive Region.

Pursuant to this ruling a trial to the Court was had. Considerable evidence concerning the nature of the area has been received and the cause has been submitted for a decision. We are of the opinion that formal findings of fact and conclusions of law are unnecessary since the basis of our holding herein is primarily a matter of law. Necessary findings of fact will be set forth in narrative form.

The Gore Range-Eagles Nest Primitive Area has been classified as such by the Forest Service since June 19, 1931, long prior to the adoption by Congress of the Wilderness Act. It is located about 90 miles west of Denver within the Arapahoe and White River National Forests and has a total area of about 61,000 acres. Included within it is about 30 miles of the so-called Gore Range of mountains, which is regarded as one of the most inaccessible ranges within the State of Colorado. Mt. Powell, having an elevation of 13,534 feet, is located within the area, and there are said to be approximately 17 other peaks with elevations in excess of 13,000 feet. The elevations range from 8,500 feet to 13,500 feet, and the greater part of this

region is classified as alpine. The East Meadow area is said to be sub-alpine. There are major streams and large lakes in the Gore area and a good many deer, elk, mountain sheep and small animals. There are no improvements other than a few abandoned cabins and temporary corrals. There are, however, extensive foot and horse trails maintained by the Forest Service.

East Meadow Creek area is, as we have indicated, contiguous to the Gore Primitive Region on the west. It consists of timbered valleys surrounded by timbered ridges. Within it are several parks, small grassy open areas from one acre to fifty acres surrounded by trees. On the average, the elevation of the East Meadow Creek region is about 10,000 feet, which is somewhat lower than the contiguous primitive area. It is located in what is known as the sub-alpine life zone. It is situated so that it may be used as an access route into the Gore Primitive Area.

The proposed sale area is located within the East Meadow Creek basin, in the Piney Lake Compartment, Eagle River Block, Holy Cross Working Circle, White River National Forest. It consists of some 1,200 acres with an elevation between 9,200 and 10,500 feet. Deer and elk are found in the sale area throughout the summer and fall months and there is light recreation use in the region during the hunting season. The trees in the sale area consist mainly of Englemann Spruce and Lodgepole Pine, some of which are as much as 350 years old, and fir, the age of which ranges up to 120 years.

The East Meadow Creek region is generally untrammeled by man except for an access road which runs to a point about three-fourths of a mile inside the sale area. There is also a road known as the "bug road" which was constructed during the bark beetle control project in the early 1950's. This road is now blocked off and cannot be used by motorized vehicles. In some places the vegetation has camouflaged the "bug road"

so that it is substantially unnoticeable. There are trails in the area.

The Denver Water Board is surveying, looking to possible use of the Meadow Creek drainage in connection with a water diversion project. There is also a possibility that a dam may be built at Piney Lake. These, however, are apparently in the early planning stages, and no definite decisions to undertake the projects have yet been made.

Substantial evidence has been presented as to the character of East Meadow Creek. The witnesses for plaintiff have testified that it is wild in that it is inhabited by animals, is thickly wooded, secluded and unspoiled. Witnesses who are familiar with wilderness say that a wilderness experience can be obtained in this area and that it is fairly accessible. They have also testified that this is an important tourist attraction which is a great source of value to Vail and which brings enjoyment to the tourists who visit it during the spring, summer and fall of each year.

Defendants' evidence does not create any serious dispute concerning the essential character of this area. Rather, they contend that their access road of itself prevents East Meadow from being classified as either primitive or wilderness, and that mining claims plus Denver Water Board surveys plus their own positive plans for the area make it more suitable for timber harvesting than for wilderness use.

It is crystal clear from the evidence that the consummation of the present sale will effectively take all of East Meadow Creek out of contention as a primitive or wilderness addition.

The original decision to harvest timber in the East Meadow Creek sale area was made sometime in the late 1950's or early 1960's, prior to the adoption of the Wilderness Act. The road was planned prior to the Act and was completed in 1965. As of that time the Forest Service was committed to a sale of the timber. It looked to the sale to pay for the road and its extensions. A multiple use survey report on the proposed contract area was issued in 1967 and a sale area planning report was approved in 1968. The timber involved in the sale constitutes approximately 4.3 million board feet. About four miles of additional haul road, as well as most secondary and spur logging roads, would be, under the contract, constructed by the purchaser.

Throughout the 1960's, and even after the passage of the Wilderness Act, 16 U.S.C. § 1131 et seq., in 1964, the Forest Service considered the East Meadow Creek area as being governed solely by the Multiple Use Act, 16 U.S.C. § 528 et seq. The Wilderness Act was felt to be inapplicable because of the road which had been constructed in the sale area and also because of the plans of the Denver Water Board. On October 4, 1967, the Wilderness Workshop of the Colorado Open Space Coordinating Council submitted a "Citizens' Preliminary Recommendation for the Establishment of the Eagles Nest Wilderness (Gore Range-Eagles Nest Primitive Area) of Approximately 111,000 Acres," which proposal suggested that a large portion of the area contiguous to the Gore Primitive Region be classified as wilderness. This included much of East Meadow Creek, but excluded the East Meadow Creek Road (see map, Appendix I). On February 13, 1969, the Eagles Nest Wilderness Committee submitted a revision of the October 4, 1967 report. This revision recommended that East Meadow Creek be included as wilderness, but excluded both the East Meadow Creek Road and Piney Lake (see map, Appendix II). The Forest Service was unmoved by these proposals, making clear to the plaintiffs that East Meadow Creek would not be included in the study and report to the President and Congress on the Gore Primitive Area and that the proposed sale and harvesting of timber would proceed as planned. The plaintiffs then instituted the present suit.

The question presented is a limited and novel one. We are concerned not with whether the Secretary erred on his factual findings in ruling East Meadow Creek out as wilderness, but rather with whether there is sufficient evidence of its wilderness character so as to require study and submission· to the President and Congress for determination of its character and whether acts which would change its character should be enjoined until the determination can be made.

■ The concept of preserving certain public lands in their natural state did not originate in the Wilderness Act. For many years primitive, wilderness and wild areas have been set aside by the Secretary of Agriculture and the Chief of the Forest Service.[1] Under the Multiple Use-Sustained Yield Act, 16 U. S.C. § 529, this authority of the Secretary of Agriculture to preserve wilderness was specifically recognized.[2] However, prior to the Wilderness Act, the issue of what areas should be designated as wilderness, wild or primitive, and what uses might be made of such areas was entirely within the discretion of the Secretary of Agriculture and the Forest Service. Thus, the administrative decisions with respect to the suitability of an area for wild, wilderness or primitive classification, the need for preserving the natural state of such an area, and the relative values of various resources in the particular area were final and unreviewable. One of the major purposes of the Wilderness Act was to remove a great deal of this absolute discretion from the Secretary of Agriculture and the Forest Service by placing the ultimate responsibility for wilderness classification in Congress. The House Report on the Wilderness Act recognizes this as the primary purpose for the Act:

A statutory framework for the preservation of wilderness would permit long-range planning and assure that no future administrator could arbitrarily or capriciously either abolish wilderness areas that should be retained or make wholesale designations of additional areas in which use would be limited.

The committee accordingly endorses the concept of a legislatively authorized wilderness preservation system. Furthermore, by establishing explicit legislative authority for wilderness preservation, Congress is fulfilling its responsibility under the U.S. Constitution to exercise jurisdiction over the public lands. H.R.Rep.No.1538 on the Wilderness Act, 2 U.S.Code Cong. & Adm.News at, pp. 3616–17 (1964).

Congress has defined wilderness as follows:

A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its pri-

---

1. In 1929, the Secretary of Agriculture established procedures for designation of primitive areas in national forests. This was superseded in 1939 by regulations establishing procedures· for designation of wilderness and wild areas. 36 C.F.R. 251.20–.21 (1967). Wilderness areas had to be in excess of 100,000 acres and could only be designated by the Secretary of Agriculture. Wild areas consisted of between 5,000 and 100,000 acres and could be designated by the Chief of the Forest Service. H.R.Rep.No.

1538 on the Wilderness Act, 2 U.S.Code Cong. & Adm.News pp. 3615, 3616 (1964).

2. The Secretary of Agriculture is authorized and directed to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom. * * * The establishment and maintenance of areas of wilderness are consistent with the purposes and provisions of sections 528–531 of this title. 16 U.S.C. § 529.

meval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value. 16 U.S.C. § 1131(c).

We are called upon in this case to determine whether under the evidence presented there is a basis for determination by the President and Congress that the area in question is wilderness within the above definition. It is obvious, of course, that the area here involved does not encompass 5,000 acres. At the same time it is, as noted, contiguous to the Gore Range Wilderness Area which has been classified as such, and it is contended that the President and Congress should determine whether this contiguous area should be included.

See 16 U.S.C. § 1132(b) which provides as follows:

> The Secretary of Agriculture shall, within ten years after September 3, 1964, review, as to its suitability or nonsuitability for preservation as wilderness, each area in the national forests classified on September 3, 1964 by the Secretary of Agriculture or the Chief of the Forest Service as "primitive" and report his findings to the President. The President shall advise the United States Senate and House of Representatives of his recommendations with respect to the designation as "wilderness" or other reclassification of each area on which review has been completed together with maps and a definition of boundaries. * * * *Nothing herein contained shall limit the President in proposing, as part of his recommendations to Congress, the alteration of existing boundaries of primitive areas or recommending the addition of any contiguous area of national forest lands predominantly of wilderness value.* (Emphasis added.)

With respect to primitive areas, this provision of the Act quite clearly reserves the decision to classify as wilderness to the President and ultimately Congress. The duty of the Secretary of Agriculture is to study and recommend, and this duty is mandatory.

■ East Meadow Creek, however, is not classified as a primitive region, but rather is *contiguous* to the Gore Primitive Area. With respect to such contiguous areas, the Act is less specific as to the division of responsibility between the Forest Service and Secretary of Agriculture on the one hand and the President and Congress on the other. Nevertheless, the last sentence of 16 U.S.C. § 1132(b) leaves no doubt that at least as to those contiguous areas which are predominantly of wilderness value, the decision to classify or not to classify them as wilderness *must remain open through the Presidential level.*

It follows from the above that

■ 1. The Wilderness Act, § 1132(b), empowers the President to recommend to the Congress the addition of contiguous primitive area of national forest lands predominantly of wilderness value.

2. The Act contemplates that the President shall be in a position to exercise a meaningful decision with respect to contiguous areas.

3. The Act contemplates that the Secretary shall consider whether a con-

tiguous area is to be included and that its determination is subject to review by the President and ultimately the Congress.

■ 4. Where as here the contiguous area is shown by the evidence to have wilderness character, it thwarts the purpose and spirit of the Act to allow the Forest Service to take abortive action which effectively prevents a Presidential and Congressional decision.[3]

These basic rules which we have outlined above are fully supported by the regulations set forth in the Forest Service Manual.[4] These regulations are designed to aid Forest Service personnel in carrying out their duties under the Wilderness Act.

Forest Service regulation 2321(1) provides that:

> Each Primitive Area (so classified as of September 3, 1964) *and contiguous lands which seem to have significant wilderness resources* will be studied to determine whether to recommend that all or part should be included in the National Wilderness Preservation System. (Emphasis added.)

This regulation is basically a definition of the duties imposed upon the Forest Service by § 1132(b) of the Wilderness Act. It requires that the Forest Service study "contiguous lands which seem to have significant Wilderness resources," and thus supports this Court's conclusion that the duties of the Forest Service under the Wilderness Act are not limited to merely studying the primitive areas.

Of course, not every area which is contiguous to a primitive region need be studied, but rather only those contiguous areas which "seem to have significant Wilderness resources." We consider this latter phrase as referring to contiguous areas which meet the minimum conditions of suitability for wilderness as defined in Forest Service regulation 2321.11(a) (which regulations are, of course, derived from the Act itself):

> 2321.11a—*Minimum Conditions.* Most of the area must satisfy, and all of the area must be such that it can be made to satisfy, the definition of Wilderness as set forth in the Wilderness Act.
>
> 1. As an area where the earth and its community of life are untrammeled by man; where man himself is a visitor who does not remain.
>
> 2. As undeveloped land retaining its primeval character and influence, without human habitation or permanent improvements, except those that are necessary to meet the minimum requirements for administration and authorized use of the area.
>
> Generally appearing to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable.
>
> 3. As having outstanding opportunities for solitude or a primitive and unconfined type of recreation.
>
> May also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

---

3. We are fully aware of the provision in 16 U.S.C. § 1132(b) which states, "Areas classified on September 3, 1964 shall continue to be administered under the rules and regulations affecting such areas on September 3, 1964 until Congress has determined otherwise." Although this provision does vest some discretion in the Forest Service prior to the ultimate Congressional decision, we do not feel that it can or should be read so as to allow the Forest Service to change the basic character of the area. Such a broad reading of the above provision would allow the Forest Service to frustrate one of the major purposes of the Wilderness Act.

4. Plaintiffs' Exhibit 1a, b & c.

4. As normally having at least 5,000 acres of land. In rare instances an area may be smaller; but if so, it must be of sufficient size to make practicable its preservation and use in an unimpaired condition.

■ There are other criteria which must be met by primitive areas and areas contiguous to primitive regions alike before the Forest Service may give a positive recommendation to the President and Congress that the particular area be classified as wilderness. For example, both availability and need must be considered. Forest Service Reg. 2321.1. Undoubtedly, as the Forest Service contends, the questions of availability and need are complex and require substantial expertise in the field of land use management for their resolution. Thus, they must be left largely to the discretion of the Forest Service.

■ However, we are not here concerned with the issue of whether or not the Forest Service must *recommend* East Meadow Creek for wilderness classification. Nor would we undertake to second guess the Secretary by a ruling that the area in question is wilderness. The only issue presented to this Court is whether the Forest Service must under the Act and its own regulations *study* East Meadow Creek, include that study in its report to the President and Congress, and refrain from acts such as the cutting of timber, which will irrevocably change its character, until the President and Congress have considered the report and rendered a decision. As stated in the Forest Service Manual, the answer to this question does not require a consideration of need or availability, but only a determination as to whether East

Meadow Creek seems to possess the inherent qualities of suitability as wilderness.[5] This determination, based as it is on substantially objective criteria set forth in both the Wilderness Act and Forest Service regulations, is as stated above largely a matter of law. Hence, we are not invading any Forest Service field of expertise. We simply hold that the Forest Service does not have uncontrolled discretion where the area is contiguous to wilderness lands and is shown to be primitive in character; that the determination must be preserved for the President and Congress; that it is not to be preempted. We, therefore, conclude that the issue as to whether a given contiguous area is suitable for wilderness classification, and hence must be studied and included in the Forest Service report to the President and Congress, is a question which is subject to judicial review.

Defendants contend that the East Meadow Creek region was included in a study made pursuant to the Multiple Use-Sustained-Yield Act, 16 U.S.C. § 528 et seq. and was found not qualified for primitive, wild, or wilderness classification. Thus, it is claimed that the Forest Service has in effect also fulfilled its duty under the Wilderness Act and any further study of East Meadow Creek would be duplicitous. Again, this argument mistakes the function of the Forest Service with respect to wilderness area under the Wilderness Act as compared with the Multiple Use Act. Under the Multiple Use Act, the authority to classify as wilderness, primitive, or wild was vested solely in the Secretary of Agriculture or the Forest Service, and the decision on these matters was based

5. The Forest Service has recognized this basic difference between the decision to study a particular region and the decision to make a positive recommendation that it be classified as wilderness. For example, in the Forest Service Report on the Flat Tops Wilderness, Plaintiffs' Exhibit 8a, several areas contiguous to the Flat Tops Primitive Area which had been suggested by interested groups for classification as wilderness were studied and included in the Forest Service Report, even though the Service ultimately determined not to recommend the areas as wilderness. *See also* Proposal for Mt. Jefferson Wilderness, Plaintiffs' Exhibit 8m.

not only on suitability, but also on availability and need. Since the Wilderness Act requires a study and report on those regions contiguous to primitive areas which merely meet the test of suitability, the Forest Service's conclusions under the Multiple Use Act are not conclusive and indeed have little bearing on the question of whether East Meadow Creek must be included in the wilderness study report to the President and Congress.

■ In applying the criteria of suitability set forth in the Wilderness Act and Forest Service regulations to East Meadow Creek, we find that at least that portion of East Meadow Creek included in the Citizens' Preliminary Recommendation for the Establishment of the Eagles Nest Wilderness, First Revision, February 13, 1969, seems to have significant wilderness resources [6] and could be determined by the President to be predominantly of wilderness value. Outside of the presence of the East Meadow Creek Road, the area in question is untrammeled by man. The Citizens' Proposal does not include the East Meadow Creek Road, and the testimony indicated that due to the dense forest conditions, this road is substantially unnoticeable from approximately 100 yards away. There was also testimony that East Meadow Creek has outstanding opportunities for solitude and a primitive and unconfined type of recreation, including hunting, hiking, back-packing, and camping. Furthermore, this region is significantly interrelated with the Gore Primitive Area. Not only is it geographically contiguous to the Gore, but it also serves as an access route into the primitive area. Although East Meadow Creek and the Gore Primitive Area are in different life zones due to the differences in altitude, both regions are inhabited by deer and elk, and the testimony indicated a possibility that destruction of the natural state of East Meadow Creek might have an adverse effect on this wildlife. The evidence shows that it is desirable to have both alpine and sub-alpine zones within a wilderness area.

In conclusion, we hold that the East Meadow Creek region meets the minimum requirements of suitability for wilderness classification and must, therefore, be included in the study report to the President and Congress. Furthermore, we find that if the proposed sale and harvesting of timber proceeds, it will frustrate the purpose of the Wilderness Act to vest the ultimate decision as to wilderness classification in the President and Congress, rather than the Forest Service and Secretary of Agriculture. The Forest Service has been considering the proposed sale of timber in East Meadow Creek for several years. The decision to sell and harvest having now been made, the Service claims that the plans must proceed immediately. We must disagree. The interests of the plaintiffs and the public in maintaining the status quo until the requirements of the Act have been fulfilled far outweigh this desire to get the job done now—after more than ten years of delay.

We are not unmindful of the interests and equities of Kaibab Industries, but here again we cannot give effect to this interest, for the cutting of the trees, is as we have noted, too final and conclusive. It must await the processes of law.

We conclude then that the cause is a proper one for equitable intervention. We determine that the preliminary injunction heretofore entered be continued indefinitely or until a determination has been made by the President and Congress that East Meadow Creek is predominantly wilderness in character and should be made part of Gore Range-Eagles Nest or that it should not be.

Plaintiffs will submit an appropriate judgment for the Court's signature.

---

**6.** The Citizens' Proposal includes a significant portion of the proposed sale area encompassing partial cuts 6 and 12.

## APPENDIX I

Citizens' Preliminary Recommendation for the Establishment of the Eagles Nest Wilderness (Gore Range-Eagles Nest Primitive Area) of Approximately 111,000 Acres.

October 4, 1967

LEGEND

------  BOUNDARY PROPOSED BY
        CITIZENS' COMMITTEE,
        OCTOBER 4, 1967

[A1226]

APPENDIX II

Citizens' Preliminary Recommendation for the Establishment of
the Eagles Nest Wilderness (Gore Range-Eagles Nest Primitive
Area) of Approximately 117,000 Acres.

February 13, 1969

LEGEND

------  REVISED BOUNDARY PROPOSED
        BY CITIZENS' COMMITTEE
[A1227]