The **WILDERNESS SOCIETY, Sierra Club, Pacific Coast Federation of Fishermen's Associations, Inc. and California Trout, Inc., Plaintiffs,**

v.

**Robert R. TYRREL, Forest Supervisor of the United States Forest Service for the Shasta–Trinity National Forests; and Paul F. Barker, Regional Forester of the United States Forest Service for Region Five, Defendants.**

**Sierra Pacific Industries, Intervenor.**

No. CIV. S–88–1322 LKK.

United States District Court,
E.D. California.

Dec. 13, 1988.

Stephan C. Volker, San Francisco, Cal., for plaintiffs.

David Dun, Dun & Arkley, Eureka, Cal., for intervenor.

Wesley Higbie, Hendrickson, Higbie & Cole, San Francisco, Cal., for amicus Timber Ass'n of Cal.

Karen Patterson, Mary L. Grad, Asst. U.S. Attys., Sacramento, Cal., for defendants.

## AMENDED ORDER

KARLTON, Chief Judge.

This case came on for hearing on October 31, 1988, pursuant to plaintiffs' motion for a preliminary injunction. Plaintiffs request interlocutory relief under Fed.R.Civ. P. 65 to preserve the status quo pending adjudication of this action. After hearing, and for good cause shown, a temporary restraining order was issued to preserve the status quo while the court considered more fully the issues raised at hearing. For reasons set forth herein, plaintiffs' motion for a preliminary injunction is granted.

## I

### CASE BACKGROUND

Plaintiffs seek to enjoin employees of the United States Forest Service from proceeding with implementation of the South Fork Fire Recovery Salvage Project ("the project"), a proposal to harvest 18.4 million board feet of burned timber and construct 8.7 miles of new roads within the South Fork Roadless Area on the Shasta Trinity National Forests. See Plaintiff's Complaint, Exh. A (Final Environmental Impact Statement, August 1988) ("Final EIS"), Record of Decision, p. 2. This area is adjacent to the South Fork Trinity River, which was designated a Wild and Scenic River by proclamation of the Secretary of the Interior on January 19, 1981. 46 Fed.Reg. 7484 (1981). Intervenor Sierra Pacific Industries, Inc., claims an interest in the project as the high bidder for a contract with the Forest Service to log the timber.[1] Pursuant to a stipulation between the parties effective until October 31, 1988, and the court's temporary restraining order imposed on October 31, 1988, as subsequently extended, no contract has yet been awarded.

---

**1.** *Amicus* Timber Association of California, a trade association, asserts a general interest in purchasing timber sold in California.

Plaintiffs contend that timber cutting and road construction authorized in the project would violate federal environmental laws, principally the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271, et seq. Plaintiffs also allege violations of the National Forest Management Act, 16 U.S.C. §§ 1600, et seq., the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321, et seq., and the Clean Water Act, 33 U.S.C. §§ 1323, et seq., as applied through the Administrative Procedure Act, 5 U.S.C. §§ 701, et seq.

On September 26, 1988, plaintiffs filed an administrative appeal of the decision approving the project and a request for stay pursuant to 36 C.F.R. § 211.16 (53 Fed. Reg. 17032 (May 13, 1988)). On October 17, 1988, the United States Forest Service denied plaintiffs' request for stay. Although the Forest Service indicated that it would "proceed as quickly as possible to complete the review of [plaintiffs'] appeal to minimize any activities that may occur prior to our decision on the merits," it also indicated that the denial of stay was "not subject to further administrative appeal or review." Plaintiffs' Points and Authorities, Exh. B. *See* 36 C.F.R. § 211.16(i).

## II

## PRELIMINARY INJUNCTION STANDARDS

As an initial matter, I must address the scope of a district court's task in adjudicating a motion for preliminary injunction in the context summarized above.

> The basis for injunctive relief is irreparable injury and inadequacy of legal remedies. This requires a court to balance the competing claims of injury and the effect on each party of granting or withholding of the requested relief.

*Sierra Club v. Penfold,* 857 F.2d 1307, 1318 (9th Cir.1988). *See also Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed. 2d 542, 553 (1987). Since the pending motion is for a preliminary injunction rather than a permanent one, plaintiffs must show "likelihood of success on the merits rather than actual success." *Penfold,* 857 F.2d at 1318; *Gambell,* 480 U.S. at 546 n. 12, 107 S.Ct. at 1404 n. 12, 94 L.Ed.2d at 556 n. 12.

The profoundly different role of evidence in a preliminary injunction bears emphasis.

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party is thus not required to prove his case in full at a preliminary injunction hearing ... and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

*University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed. 2d 175 (1981) (citations omitted).

The Ninth Circuit has recognized two interrelated tests for determining the propriety of the issuance of a preliminary injunction. Under the

> "traditional test" typically applied in cases involving the public interest, "a preliminary injunction is justified when: (1) the moving party has established a strong likelihood of success on the merits; (2) the balance of irreparable harm favors the moving party; and (3) the public interest favors the issuance of an injunction."

*Northern Alaska Environmental Center v. Hodel,* 803 F.2d 466, 471 (9th Cir.1986) (quoting *Regents of the University of California v. American Broadcasting Cos., Inc.,* 747 F.2d 511, 515 (9th Cir.1984)).

Under the second "alternative" formulation of preliminary injunction standards, plaintiffs may meet their burdens by demonstrating that *either* of the following two combinations is present: "(1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party seeking relief." *Friends of the Earth v. U.S. Navy,* 841 F.2d 927, 933 (9th Cir.1988). The different

formulations of the governing standards "are not two independent tests, but the extremes of the continuum of equitable discretion." *Id.* As this court has had occasion to observe, the alternative test does not excuse the moving party from demonstrating, "at a minimum, that there is a 'fair chance of success' on the merits, even if the balance of hardships tips sharply in its favor." *Catholic Social Services v. Meese,* 664 F.Supp. 1378, 1381 (E.D.Cal. 1987). *See also Diaz v. I.N.S.,* 648 F.Supp. 638, 643 (E.D.Cal.1986). Before applying the familiar preliminary injunction standards noted above to the case at bar, however, I must also address the question tendered by plaintiffs of whether, in any of the statutes under which plaintiffs have stated claims, Congress has abrogated this court's ordinary equitable discretion in injunction proceedings to consider the balance of hardships. *See TVA v. Hill,* 437 U.S. 153, 193–95, 98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117 (1978) (Endangered Species Act); *Friends of the Earth,* 841 F.2d 927, 933 (9th Cir.1988) (National Defense Authorization Act).

■ In the typical case, the fact that a statutory violation is alleged will not itself require the court to relinquish its discretionary standards on preliminary injunction motions.

> Although particular regard should be given to the public interest, "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."

*Gambell,* 480 U.S. at 542, 107 S.Ct. at 1402, 94 L.Ed.2d at 553–54 (quoting *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982)). Consequently, "a Congressional grant of jurisdiction to insure compliance with a statute will not ordinarily limit the court's discretion to issue or deny injunctions unless the statute 'in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity.'" *Save The Yaak Committee v. Block,* 840 F.2d 714, 722 (9th Cir.1988) (quoting *Gam-*

*bell,* 480 U.S. at 542, 107 S.Ct. at 1403, 94 L.Ed.2d at 554).

■ I must determine whether any of the statutes that form the basis for plaintiffs' claims raise such a necessary or inescapable inference restricting the court's equity jurisdiction. Plaintiff does not allege, nor does the court find, that any basis for such an inference is raised by the National Forest Management Act, 16 U.S.C. §§ 1600, et seq. With respect to the claim under NEPA, 42 U.S.C. §§ 4321, et seq., the answer is plainly negative. The Ninth Circuit has rejected any presumption of irreparable injury under NEPA when "an agency fails to thoroughly evaluate the environmental impact of a proposed action...." *Save the Yaak,* 840 F.2d at 722. *See also Northern Cheyenne v. Hodel,* 851 F.2d 1152, 1158 (9th Cir.1988). Similarly, plaintiffs' claim based upon a violation of the Clean Water Act, 33 U.S.C. §§ 1323, et seq., does not foreclose this court's equitable considerations relative to a request for preliminary injunctive relief. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 320, 102 S.Ct. 1798, 1807, 72 L.Ed.2d 91 (1982). In *Weinberger,* the Supreme Court cautioned that "a major departure from the long tradition of equity practice should not be lightly implied." *Id.* Holding that the Clean Water Act did not require a federal court to immediately enjoin all discharges that did not comply with its permit requirements, the Court emphasized that "[t]he integrity of the Nation's waters" rather than "the permit process" was the purpose of the Act. *Id.* at 314, 102 S.Ct. at 1804. The system of phased compliance in the statute suggested to the High Court that "this is a statute in which Congress envisioned, rather than curtailed, the exercise of discretion." *Id.* at 316, 102 S.Ct. at 1805.

A more difficult question is whether, as plaintiffs contend, Congress intended the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271, et seq., to curtail this court's power to balance the equities on a case-by-case basis. To answer this question, I must look to the "underlying substantive policy" that Congress designed the statute to effect, rather than its statutory procedure.

*Gambell,* 480 U.S. at 544, 107 S.Ct. at 1403, 94 L.Ed.2d at 555; *Northern Cheyenne,* 851 F.2d at 1156.

The Wild and Scenic Rivers Act declares a policy

> that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that their immediate environments shall be protected for the benefit and enjoyment of present and future generations.

16 U.S.C. § 1271. The question is whether the Act bears a stronger resemblance to *TVA* and *Friends of the Earth,* in which Congress made explicit prohibitions that left no room for district court discretion, or to *Weinberger* and *Gambell,* where the statutes themselves contemplated some discretionary evaluation. *Compare TVA,* 437 U.S. at 187, 98 S.Ct. at 2298 (statute did not "provide[ ] federal courts with authority to make such fine utilitarian calculations") *and Weinberger,* 456 U.S. at 318, 102 S.Ct. at 1806 (statute permitted exercise of court's equitable discretion "to order relief that will achieve *compliance* with the Act").

In *TVA,* the "language, history, and structure" of ESA demonstrated a Congressional determination that the balance of hardships and public interest favored preservation of the endangered species. 437 U.S. at 174, 187–88, 194–95, 98 S.Ct. at 2298–99, 2301–02. In a less direct way, such a balance seems to have animated the original WSRA. *See, e.g.,* H.R.Rep. No. 1623, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 3801, 3802 (citing National Park Service's recommendation "that certain streams be preserved in their free-flowing condition because their natural scenic, scientific, esthetic and recreational values outweigh their value for water development and control purposes"). Moreover, it appears that the South Fork Trinity River was designated pursuant to 16 U.S.C. § 1273(a)(ii) notwithstanding forestry concerns raised by both the timber industry and the United States Forest Service. *See* Fairfax, Andrews,

Buchsbaum, *Federalism and the Wild and Scenic Rivers Act: Now You See It, Now You Don't,* 59 Wash.L.Rev. 417, 439–46 (1984). Both these facts suggest that all the balancing between conflicting interests occurred prior to the instant litigation and that in effect Congress ordered preservation of the area.

■ Nonetheless, it appears to the court that there are two critical differences between the *TVA* line of cases and the matter at bar. First, the *TVA* line of cases raised no dispute as to whether failure to grant the injunction would constitute a statutory violation. *See TVA,* 473 U.S. at 172, 98 S.Ct. at 2291 (no dispute as to destruction of snail darter habitat); *Friends of the Earth,* 841 F.2d at 932 (no dispute as to violation of prohibition against any construction without permit). In contrast, defendants here have at least contested this underlying premise with extensive exhibits that raise factual issues not susceptible to *a priori* determination. Second, the fact that the WSRA directs that the executive engage in a relatively flexible review process militates against a similar analytical process being prohibited to the court. The statute provides that:

> Each component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values. In such administration primary emphasis shall be given to protecting its esthetic, scenic, historic, archeologic and scientific features. Management plans for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area.

16 U.S.C. § 1281(a). Put another way, application of WSRA does not yield an automatic inference of prohibited conduct without a threshold determination that the activity in question may substantially interfere with the substantive values the Act was designed to preserve. Such a statu-

tory scheme does not require a necessary and inescapable inference that Congress intended to remove this court's equitable discretion. *See Gambell,* 480 U.S. at 544, 107 S.Ct. at 1403, 94 L.Ed.2d at 555 (district court found that the contested exploration activities would not significantly restrict subsistence uses under Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3120).

Although the court has determined that alleged violation of the WSRA does not require an automatic preliminary injunction without a balance of the hardships, the modest consequence of the holding must be emphasized. While *Gambell* does caution against an automatic presumption of irreparable injury, it also suggests why such a presumption is generally unnecessary in environmental litigation. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often of permanent or long duration, *i.e.,* irreparable." *Save the Yaak,* 840 F.2d at 722; *Gambell,* 480 U.S. at 545, 107 S.Ct. at 1404, 94 L.Ed.2d at 555. Thus, when environmental injury is "sufficiently likely ..., the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* A district court must "expressly consider the public interest on the record," and the record must be "adequate." *Northern Cheyenne,* 851 F.2d at 1157, 1158 (remanding case for evidentiary hearing where the record was inadequate to balance equities). Even without an automatic presumption of irreparable injury, the statutory framework and its underlying objectives must inform the court's use of its equitable discretion in balancing the relative injuries. *See, e.g., Parker v. United States,* 309 F.Supp. 593 (D.Colo.1970), *aff'd,* 448 F.2d 793 (10th Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972).

## III

## CANONS OF STATUTORY CONSTRUCTION

In order to make a preliminary assessment of plaintiffs' likelihood of success on the merits of its principal claim, I must address several issues of first impression pertaining to the scope and mechanics of defendants' statutory obligations to protect a segment of a state-designated Wild and Scenic River, *see* 16 U.S.C. § 1273(a)(ii), that is located on federal land within the regulatory jurisdiction of the United States Department of Agriculture, United States Forest Service. These issues are addressed in detail in Section IV of this Order, *infra.* In support of their disparate readings of the governing statutory obligations, the parties have filed a morass of supplementary materials ranging from legislative history to agency manuals and study reports to purported statements of opinion by individual officials.[2] Before discussing plaintiffs' likelihood of success on the merits, I must briefly examine when and to what purpose a court may use such extrinsic material to aid textual analysis of the statute. This discussion leads in turn to consideration of the types of extrinsic materials which may have the force of law and the legal doctrine applicable to issues concerning an administrative agency's obligation to follow its own regulatory policies.

■ When construing a statute in a case of first impression, it is proper for this court to "look to the traditional signposts of statutory construction." *Brock v. Writers Guild of America, West, Inc.,* 762 F.2d 1349, 1353 (9th Cir.1985).[3] The first step in the traditional analysis is a direct look at the text itself. "[I]f the language of a statute is clear and there is no ambiguity, then there is no need to 'interpret' the

2. Among the sources of administrative authority presented to the court are the following: guidelines promulgated by the Departments of Interior and Agriculture pertaining to federal responsibilities relative to state-designated Wild and Scenic Rivers; the final Environmental Impact Statement issued by the Department of Interior discussing the designation of the river at issue; the final Environmental Impact Statement issued by the Regional Forest Supervisor discuss-

ing the timber sale at issue; the United States Forest Service's official Forest Service Handbook; and a regional supplement to the United States Forest Service's official Forest Service Manual.

3. The court has discussed these signposts in greater detail in *Catholic Social Services,* 664 F.Supp. at 1382–83.

language by resorting to the legislative history or other extrinsic aids." *Church of Scientology of California v. U.S. Dep't of Justice*, 612 F.2d 417, 421 (9th Cir.1979). *Accord I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 445 n. 29, 107 S.Ct. 1207, 1220 n. 29, 94 L.Ed.2d 434, 456 n. 29 (1987). While the syntax in complex environmental statutes is rarely heralded for its accessibility or simplicity, the "ordinary and obvious meaning" of a phrase is "not to be lightly discounted." *Id.* at 431, 107 S.Ct. at 1213, 94 L.Ed.2d at 447. Words are presumed to have their ordinary meaning unless a special usage is evident in the statutory scheme. *See Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). " '[V]ery strong' evidence or explicit language from legislative history is necessary to overcome the plain meaning naturally to be drawn from the language of the statute." *In re Seidel*, 752 F.2d 1382, 1385 (9th Cir.1985) (citation omitted).

■ Where the text of the statute and the legislative history do not resolve an impasse in statutory construction, extrinsic materials from administrative agencies may be considered.[4] Since final determination of a legal question is left to courts, an agency's interpretation is not by itself conclusive. *See Social Security Board v. Nierotko*, 327 U.S. 358, 369, 66 S.Ct. 637, 90 L.Ed. 718 (1946); *Deukmejian v. United States Postal Service*, 734 F.2d 460, 462 (9th Cir.1984); *Sierra Club v. Watt*, 608 F.Supp. 305, 330 (E.D.Cal.1985); *Diaz*, 648 F.Supp. at 644–45.

■ As I explain below, a different but related issue concerns an agency's obligation to follow its own regulations. In a given case, an agency's regulations may not be tendered to the court for the purpose of interpreting the statute, but rather to compel the agency to abide by its own regulations, whatever the propriety of the agency's interpretation. *See Service v. Dulles*, 354 U.S. 363, 372, 77 S.Ct. 1152, 1157, 1 L.Ed.2d 1403 (1957). *Accord Northern Cheyenne*, 851 F.2d at 1157 (holding that it was an "abuse of discretion not to order the Secretary [of Interior] to follow his own rules"). On the other hand, the agency's obligation to follow its own regulations may have implications relative to a case in which the issue is statutory interpretation. Thus the same principle of orderly government which requires an agency to follow its own regulations should ordinarily preclude the agency from arguing in court for an interpretation different than that adopted by the agency pursuant to the rulemaking process.

■ Several different concerns may be raised when the statements of administrative agencies or their administrators are utilized in the process of statutory construction. The most typical controversy arises in instances where the validity of a regulation is in question. Where this is the case, the substantive scope of judicial review turns upon the difficult distinction between "legislative" and "interpretative" rulemaking. *See Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977); *United States v. Fifty–Three Eclectus Parrots*, 685 F.2d 1131, 1136 (9th Cir.1982).[5] In the instant case, however, none of the parties have challenged the validity of any of the sources of administrative authority. In the absence of such challenge, I will assume their validity. *See Diaz*, 648 F.Supp. at 644. Questions are presented, however, as to whether these sources are to be considered "agency interpretations" for purposes of assisting statutory construction; and as to the due process implications of permitting a regulatory body to violate its own standards to

---

4. "[C]anons of construction extrinsic to the text" may not "be employed to create an ambiguity which is not inherent in the language employed by Congress, or at least resulting from examination of the legislative history.... [D]eference to the agency's construction is a form of extrinsic statutory construction and is thus significant only if ambiguity exists as a result of textual examination." *Catholic Social Services*, 664 F.Supp. at 1382.

5. "A legislative rule is the product of an exercise of delegated legislative power to make law through rules. An interpretative rule is any rule an agency issues without exercising delegated legislative power...." K. Davis, *Administrative Law Treastise* § 7:8, at 36 (2d ed. 1979). I have discussed the consequences of this distinction in *Sierra Club v. Watt*, 608 F.Supp. 305, 328–29 (E.D.Cal.1985).

the detriment of plaintiffs' substantive rights.

In considering whether a particular statement may be construed as an official administrative interpretation, I must consider whether it has the imprimatur of formal approval from the national agency in question. As this court has observed, a "formal agency interpretation dispensed from the agency's national headquarters and intended to apply nationally constitutes an agency interpretation." *Id.* at 645. *See Miller v. Youakim,* 440 U.S. 125, 144, 99 S.Ct. 957, 968, 59 L.Ed.2d 194 (1979) (giving effect to a program instruction published by HEW). To constitute an agency interpretation, however, a particular guideline does not necessarily have to have been codified as a formal regulation. *See, e.g., Sierra Club v. Clark,* 774 F.2d 1406, 1408–09 (9th Cir.1985) (Bureau of Land Management required to follow interim management policy and guidelines); *Foundation for North American Wild Sheep v. United States,* 681 F.2d 1172, 1182 (9th Cir.1982) (United States Forest Service required to follow regulations contained in Forest Service Manual); *Morton v. Ruiz,* 415 U.S. 199, 233–34, 94 S.Ct. 1055, 1073–74, 39 L.Ed.2d 270 (1974) (Bureau of Indian Affairs required to follow the "substantive policies" formally published in its manual); *United States v. Heffner,* 420 F.2d 809, 812 (4th Cir.1969) (IRS required to follow published instructions to agents even though they "were not promulgated in something formally labeled a 'Regulation' ").

In contrast, statements that lack the imprimatur of official authorization are viewed more skeptically and have little significance in the interpretive process. *See, e.g., Lyng v. Payne,* 476 U.S. 926, 937, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986) ("not all agency publications are of binding force"); *Schweiker v. Hansen,* 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d

685 (1981) (Social Security Administration not required to follow claims manual that was a "handbook for internal use" by its employees); *Miller,* 440 U.S. at 145 n. 25, 99 S.Ct. at 969 n. 25 (letter from HEW general counsel did not reflect an "official position"); *Rank v. Nimmo,* 677 F.2d 692, 698 (9th Cir.1982), *cert. denied,* 459 U.S. 907, 103 S.Ct. 210, 74 L.Ed.2d 168 (1982) (internal handbook of Veterans Administration was not intended to have force of law).[6]

The problem of deference takes on added complexity when viewed in light of the obligation of an agency to adhere to its own regulations. It is "by now axiomatic that agencies must comply with their own regulations while they remain in effect." *Memorial, Inc. v. Harris,* 655 F.2d 905, 910–11 n. 14 (9th Cir.1980). This principle instructs federal courts to "require federal agencies to abide by the agency's own regulations, even where the regulations are more generous than required by law." *Ruangswang v. Immigration and Naturalization Serv.,* 591 F.2d 39, 46 n. 12 (9th Cir.1978); *United States v. Newell,* 578 F.2d 827, 834 (9th Cir.1978). Rather than simply evincing a regard for the accuracy of statutory or regulatory construction, this principle embodies the concern, rooted in due process notions of fair play, that the orderly administration of justice cannot permit a government agency to inform the public of one body of law and follow another.

> When administrative bodies promulgate rules or regulations to serve as guidelines, these guidelines should be followed. Failure to follow such guidelines tends to cause unjust discrimination and deny adequate notice contrary to fundamental concepts of fair play and due process.

*N.L.R.B. v. Welcome–American Fertilizer Co.,* 443 F.2d 19, 20 (9th Cir.1971). Where

6. This court has acknowledged elsewhere that "the absence of a consistent standard by which to determine whether a statement issued by the agency is an official agency interpretation" complicates the task of determining whether a federal court should defer to the constructions of an administrative agency's staff. *Diaz,* 648 F.Supp. at 645. *See, e.g., California v. FHA,* 561 F.2d

731, 733–34 and n. 4 (9th Cir.1977) (deference given to affidavit submitted by administrative manager or FHA state division office); *Medberry v. Hegstrom,* 786 F.2d 1389, 1391 (9th Cir. 1986) ("great deference" given to construction of agency regulation set forth in agency's amicus brief).

the agency's failure to follow its own guidelines has upset the substantive exercise of interests plaintiffs assert under the governing statute, the due process regard for consistency has not been limited to instances in which a regulation has been formally promulgated. *See, e.g., Morton,* 415 U.S. at 235, 94 S.Ct. at 1074 (where information in manual embodies an "important substantive policy" and affects eligibility requirements, agency "must comply, at a minimum, with its own procedures"). *Accord Vitarelli v. Seaton,* 359 U.S. 535, 539, 79 S.Ct. 968, 972, 3 L.Ed.2d 1012 (1959). Even beyond the particular litigants in a particular action, the court's commitment to the orderly administration of justice is endangered when official agency documents have consistently articulated broadly protective guidelines, only to have these practices contradicted by government attorneys once the agency reaches the adjudicative stage. *See generally* Note, *Violations by Agencies of their Own Regulations,* 87 Harv.L.Rev. 629, 630 (1974) (emphasizing the "important regulatory interest in the consistency of agency action"). For these reasons, courts must be reluctant to entertain agency arguments which are predicated upon an asserted impropriety of their own interpretative regulations.[7]

Having considered the mode of interpretation application to an examination of the statutes in question and explored the impact of the requirement of administrative consistency, I now turn to the primary statute in issue.

## IV

## WILD AND SCENIC RIVERS ACT

▮▮▮▮ Plaintiffs' arguments under the Wild and Scenic Rivers Act present a mix of questions of law and fact. While questions of fact resolved in the course of administrative decision relative to environmental issues are ordinarily reviewed for clear error, questions of law are reviewed de novo. *See Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 493 (9th Cir.1987). A reviewing court is not limited to the grounds invoked by an agency when the issue in dispute is interpretation of a federal statute. *Railway Labor Executives' Ass'n v. I.C.C.,* 784 F.2d 959, 969 (9th Cir.1986).

### A. *Introduction*

The Wild and Scenic Rivers Act declares that:

> [T]he established national policy of dam and other construction at appropriate sections of the rivers of the United States needs to be complemented by a policy that would preserve other selected rivers or sections thereof in their free-flowing condition to protect the water quality of such rivers and to fulfill other vital national conservation purposes.

16 U.S.C. § 1271. While, as noted earlier, the Act does not make an automatic presumption that construction projects within a protected area will contravene the underlying values, it is noteworthy that the substantive commitment is to preservation rather than the ad-hoc balancing of policy objectives that might occur if no such substantive commitment existed. Thus, the Act's "first" principle is that

> [J]ust as the Nation has set aside some of its land areas in national parks, national monuments, national historic sites, and the like, so some of its streams which have exceptional values of the sorts mentioned above—scenic, recreational, esthetic, and scientific—ought to be *preserved* for public use and enjoyment.

H.R.Rep. No. 1623, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad. News 3801, 3803 (emphasis added).[8]

---

**7.** While an agency may confess error, such a confession should ordinarily not be permitted to support actions by the agency taken prior to the concession and in contravention of the agency's formal interpretation. To permit such a confession to have the effect of abandoning the agency's formal position would not ordinarily be consistent with orderly or fair procedure.

**8.** "Thus, in establishing the national wild and scenic rivers system, Congress' goals were decidedly preservationist. According to the Act, the land and water resources that comprise the system must be managed essentially as wilderness." Gray, *No Holier Temples: Protecting the National Parks Through the Wild and Scenic Rivers Act,* 58 U.Colo.L.Rev. 551, 553 (1988). *See also* Tarlock & Tippy, *The Wild and Scenic*

The Act expressly provides that the federal agency "having jurisdiction over any lands which include, border upon, or are adjacent to" a designated river *"shall* take such action respecting management policies, regulations, contracts, plans, affecting such lands ... as may be necessary to protect such rivers in accordance with the purposes of this chapter." 16 U.S.C. § 1283(a) (emphasis added). The plain meaning of the word "shall" requires the governing federal agency to implement such a management agenda before making commitments of government resources that raise a significant likelihood of threatening the values upon which the Act is based. In setting forth the required managerial agenda, Congress voiced special concerns about the environmental implications of timber harvests and road construction relative to the Act's agenda. Thus, the Act provides that "[p]articular attention shall be given to scheduled timber harvesting, road construction, and similar activities which might be contrary to the purposes of this chapter." 16 U.S.C. § 1283(a). In sum, while timber cutting and road construction within Wild and Scenic River corridors are not considered by definition to substantially interfere with the Act's objectives, Congress has specifically singled out these activities as the very sorts of concerns for which the Act's compulsory management plans are of critical significance.

As representatives of the United States Forest Service, defendants do not contest that the agency has jurisdiction over the land that would be affected by the proposed timber sale. *See* 36 C.F.R. § 200.3(b)(2)(i) (Forest Service jurisdiction over lands within National Forest System); 16 U.S.C. § 1283(a) (agency having jurisdiction over the referenced lands is subject to compulsory management requirements). Nor do defendants deny that "[a] river management plan has not been completed for the river." Final EIS at III–34. Nonetheless, they argue that relief should be denied because they contend that as a matter of law, plaintiffs' claims are outside the intended scope of the Wild and Scenic Rivers Act. Before examining that claim, a brief explanation of the method by which the river in issue was designated as wild and scenic must be recounted, as well as certain consequences of that history.

The subtle questions of statutory construction tendered by this suit require recognition in the first instance that the South Fork of the Trinity River received statutory protection under a special state-initiated process, *see* 16 U.S.C. § 1273(a)(ii), rather than through the more typical routes of Congressional designation, *see* 16 U.S.C. §§ 1273(a)(i), 1274(a), or federal study for potential future inclusion, 16 U.S.C. § 1276(a). Rather than providing for exclusive state control, the state-initiated process provides for an interrelated system of state and federal responsibilities.[9] The Act provides that a state governor may request the Secretary of the Interior to designate as a National Wild and Scenic River those rivers that "are designated as wild, scenic or recreational rivers by or pursuant to an act of the legislature of the state or states through which they flow." 16 U.S.C. § 1273(a)(ii). The Secretary of the Interior must publish the application in the Federal Register and must determine that the river meets the "criteria established [in the Act] and such criteria supplementary thereto as he may prescribe." *Id.* Rivers designated under 1273(a)(ii) "shall be administered by the state or political subdivision thereof without expense to the United States other than for administration and management of federally owned lands." *Id.* Where a state-designated river flows through federal land, however, it is clear that the pertinent federal agency

*Rivers Act of 1968,* 55 Cornell L.Rev. 707 (1970) ("the legislation became more than a counterweight to federal dam-building programs; it is also an effort to limit the development of certain rivers and their banks in the name of recreation").

**9.** In practice, this interrelated system cannot be divided superficially into "state" and "federal" concerns. More typically, the process plays host to a variety of intermeshing interests that reflect conflicting land management objectives in both federal and state arenas. At times, this intermeshing weaves quite a tangled web. *See generally,* Fairfax, Andrews, Buchsbaum, *supra,* 59 Washington L.Rev. 401 (1984).

remains responsible for implementing the Act's management agenda.[10]

Pursuant to the Governor of California's formal petition, 45 Fed.Reg. 52459 (August 7, 1980) and the Secretary of Interior's findings under 16 U.S.C. § 1273(a)(ii), the South Fork of the Trinity River was declared a Wild and Scenic River in 1981. Its segments were designated as a combination of "wild" and "scenic" areas. Plaintiff's Points and Authorities, Exh. I (U.S. Department of the Interior Heritage Conservation and Recreation Service, *Final Environmental Impact Statement: Proposed Designation of Five California Rivers in the National Wild and Scenic Rivers System,* December 1980) ("1980 EIS") Appendix D at D-3. As amended, joint regulations of the Departments of Interior and Agriculture indicate that "there should be ... no ongoing timber harvest" in wild areas, 47 Fed.Reg. 39457 (September 7, 1982), and that in scenic areas, any timber harvest must be "accomplished without a substantial adverse effect on the natural appearance of the river or its immediate environment." As published regulations promulgated by a national agency, these provisions plainly qualify as official agency interpretation under the indicia suggested in *Miller,* 440 U.S. at 145 n. 25, 99 S.Ct. at 969 n. 25.

Plaintiffs contend that because defendants have failed to set a specific managerial agenda for the area covered under the Act, and because a significant likelihood exists that the timber harvest will not preserve the values embodied in the Act, defendants should not engage or permit others to engage in proscribed or limited activity on any of the contested land. I now turn to defendants' arguments in opposition asserting that the proposed timber sale is outside the Act's reach.

## B. *River Corridor Boundaries*

 Defendants contend that the timber sale in issue does not permit cutting or road building on any lands potentially within a river corridor subject to the Act's protection. In their reading of the statute, one quarter mile is the maximum corridor boundary that a management plan might choose to include in the river designation. I cannot agree. The most natural reading of the pertinent provisions, viewed in the context of the statute as a whole, suggests that the statute's express boundary limitations are only applied in the context of *federally* designated rivers. Thus, any such limitation would not apply to this state designated river.

Defendants principally rely on two sections of Title 16. Section 1274(b) of Title 16, as recently amended, provides that:

> The agency charged with the administration of each component of the national wild and scenic rivers system designated by subsection (a) of this section shall, within one year from designation of subsection (a) (except where a different date if provided for in subsection (a)), establish detailed boundaries therefor (which boundaries shall include an average of not more than 320 acres of land per mile measured from the ordinary high water mark on both sides of the river).

*Congressional Record* § 15279 (October 7, 1988).[11] This issue is whether this provision applies to state-designated as contrasted with federally-designated rivers.

It is fundamental that the language of the subsection at issue must be read in the context of the statute as a whole, *Stafford v. Briggs,* 444 U.S. 527, 535, 100 S.Ct. 774, 780, 63 L.Ed.2d 1 (1980). Put another way, the plain meaning of words is derived from the context in which they are used, *i.e.,* "the meaning of words depends on their context." *Shell Oil Co. v. Iowa Dept. of*

---

10. The Act provides that "[n]othing in this subsection shall be construed to provide the transfer to, or administration by, a state or local authority of any federally owned lands which are within the boundaries of any river included within the system under clause (ii)." 16 U.S.C. § 1273(a)(ii).

11. The legislative history of the 1988 amendment clarifies that it is simply a technical change not intended to alter the substance of the Act. *See* S.Rep. No. 481, 100th Cong., 2d Sess. 14, 1988 U.S.Code Cong. & Admin.News 3574, 3580 (1988). Noticeably absent is any indication that this provision would pertain to *segments* of state-designated rivers falling on federal lands.

*Revenue,* —— U.S. ——, ——, 109 S.Ct. 278, 281, 102 L.Ed.2d 186 (1988). The text of the cited provision specifically refers to 16 U.S.C. § 1274(a), which is the system of congressional designation under the Act. In contrast, where Congress intended a provision to apply to rivers designated by states under 16 U.S.C. § 1273(a)(ii), it expressly said so. *Compare* 16 U.S.C. § 1283(a) (providing for federal management responsibilities to protect rivers designated or under consideration for inclusion in accordance with sections 1273(a)(ii), 1274(a), and 1276(a)). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Cardoza–Fonseca,* 480 U.S. at 432, 107 S.Ct. at 1213, 94 L.Ed.2d at 448. *See also Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983).[12]

16 U.S.C. § 1275(d) is inapplicable for similar reasons. As amended in 1986, this provision provides that:

> The boundaries of any river proposed in section 1276(a) for potential addition to the National Wild and Scenic Rivers System shall generally comprise that area measured within one-quarter mile from the ordinary high water mark on each side of the river. In the case of any designated river, prior to publication of boundaries pursuant to section 1274(b) of this title, the boundaries also shall comprise the same area. This subsection shall not be construed to limit the possible scope of the study report to address areas which may lie more than one quarter mile from the ordinary high water mark on each side of the river.

16 U.S.C. § 1275(d). Again, this language makes specific reference to Congressionally designated rivers, while containing no references to the state designation process under 1273(a)(ii). It first refers to § 1276(a), which provides for congressional study of specific rivers for potential congressional designation. Next, it refers to rivers designated prior to setting of boundaries under section 1274(b). As noted above, § 1274(b) authorizes a specific limited corridor only for congressionally designated rivers. Accordingly, neither of the provisions that serve as reference points for § 1275(d) have anything to do with the state designation process.[13] In sum, defendants' attempt to engraft the limitation of the corridor provided for federally designated rivers onto state designated rivers must fail, since a natural reading of the statute simply does not support it.

The legislative history of the Act does not suggest otherwise. The original House Report on the Act distinguishes between rivers designated by an Act of Congress and those designated by "an act of the legislature of the state through which it flows" and subsequent approval by the Secretary of the Interior. In the next paragraph, the Secretary of Interior is "authorized to prescribe supplementary criteria. Certain other standards set up for a federally administered river—for instance, the maximum acreage that a federal agency may acquire along a Wild and Scenic River —are not applicable to state-controlled units of the national scenic river system." H.R.Rep. No. 1623, *supra,* 1968 U.S.Code Cong. & Admin.News at 3809. The natural reading of the text, in context with the preceding paragraph, suggests that the Secretary of the Interior does have broad powers to establish standards independent of the federal designation process and its limitations. Moreover, the boundary limitation referred to pertains to acquisition of

---

**12.** While the canon of construction cited in the text might be viewed as an extrinsic aid to construction and thus inapposite to a plain meaning analysis, to the degree that defendants argue for an application of section 1274(b) to state designated rivers, defendants' assert an ambiguity not as to the meaning of the words, but as to their application. Use of the canon of construction under such circumstances would thus not appear to do violence to the sequential

process I have indicated should as a general matter be employed in resolving issues of statutory construction. *See Catholic Social Services, Inc. v. Meese,* 685 F.Supp. 1149, 1152 (E.D.Cal. 1988).

**13.** Also *compare* section 1283(a), whose text specifically mentions rivers *"in accordance with section 1273(a)(ii), 1274(a), or § 1276(a)."*

lands, not to the size of the management corridor, *see* 16 U.S.C. § 1279(b) (one quarter mile acquisition boundary). Finally, defendants make the assumption, not present in the text, that the reference to a federally administered river applies with equal force to a federally administered segment of a state designated river. However, the preceding paragraph suggests that this section of the legislative history was rejecting precisely this assumption: namely, that federal standards (as promulgated by the Secretary of the Interior) relative to state designated rivers under section 1273(a)(ii) must be identical to federal standards issued by Congress relative to federally designated rivers under section 1274(a) and section 1276(a).

I conclude from all the above that both the statute's language and history do not limit the corridor for state designated rivers coursing through federal land to one-quarter mile.

Assuming, *arguendo*, that there is any ambiguity in the text and legislative history, application of extrinsic aids fully support the court's conclusion. Historically, the courts have given "great deference" to contemporaneous constructions of the governing regulatory scheme by the agency charged with its implementation. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). There is no dispute that, pursuant to its authority under 16 U.S.C. § 1273(a)(ii), the Department of Interior had designated the Heritage Conservation and Recreation Service as the appropriate federal agency to promulgate the regulations clarifying the designation of the South Fork of the Trinity River. *See* 34 Fed.Reg. 14337 (Sept. 12, 1969); 1980

EIS at Appendix D. As defendants themselves concede, the Final EIS, which accompanied the Secretary of the Interior's proclamation of the South Fork Trinity's Wild and Scenic River status, suggested an official interpretation that "states could designate broader corridors...." Defendants' Amended Opposition, filed October 28, 1988, p. 16 n. 2. The implementing agency stated:

> The Director of the Heritage Conservation and Recreation Service (November, 1980) has indicated "that there are no limitations on boundaries of rivers designated under section 2(a)(ii) [16 U.S.C. § 1273(a)(ii)]. The limitation on boundaries [in] 3(b) [16 U.S.C. § 1274(b)] ... apply only to congressionally designated rivers. On federal lands the federal manager shall determine what, if any, boundaries are to be established and the state should do likewise on nonfederal lands."

1980 EIS at IV–33.[14] Under the *Miller* line of authority discussed in section III of this order, I find that this regulatory construction of managerial responsibility possesses a sufficient imprimatur of official authority to be given great weight, in light of its preparation by the agency authorized to promulgate regulations, its joint appearance with the Secretary of the Interior's decision to designate the river at issue, and its consistency with the conclusion reached above based upon the most natural reading of the statute and the legislative history.[15]

Ironically, the Final EIS filed by the responsible agency in connection with the proposed timber sale flatly contradicts the construction of the statutory scheme urged by defendants' counsel at hearing.[16] That

---

**14.** I have given no weight to an unsigned declaration, filed by plaintiffs and attributed to the former Heritage Conservation and Recreation Service director, which purports to interpret section 1273(a)(ii). Even if this declaration were signed, it would lack the imprimatur of official authorization to constitute an agency interpretation. *See Miller*, 440 U.S. at 144, 99 S.Ct. at 968.

**15.** While conceding that this statement stood at least initially as an official agency interpretation, defendants contend it is inapposite because its issuance predated the 1986 amendments to sections 1274(b) and 1275(d). As previously

discussed, *supra*, both these provisions, even as amended, pertain specifically to Congressional designation processes, and accordingly, would have no effect on the discretion to adopt broader boundaries in a management plan under section 1273(a)(ii). Defendants also argue that the 1968 legislative history exempts those segments of state designated rivers that fall on federal lands, but as discussed above, this construction is not supported by the text.

**16.** Forest Supervisor Donald Tyrrel, a defendant in this litigation, is listed as the "responsible official" for EIS preparation.

document's discussion of the Wild and Scenic River implications of the timber sale states as follows:

> A river management plan has not been completed for the river. Public Law 99–950 [i.e., 1986 amendment to WSRA] "directs that river areas designated as wild/scenic be managed to be compatible with wild/scenic river purposes for a minimum distance of one quarter mile from each side of the riverbanks until the final river area boundaries are determined in a river management plan."

Final EIS, at III–34.[17] Although one might question whether, as an initial matter, comments in a regional supervisor's EIS may be considered a statement of official agency interpretation, I find that this EIS is probative of final agency action by virtue of the authority delegated to the supervisory official, 36 C.F.R. § 219.10(c)(1), by virtue of its consistency with other intrinsic and extrinsic aids to statutory construction, and by virtue of its review before the national agency, which denied a stay and indicated, pursuant to 36 C.F.R. § 211.16, that no further agency relief would be available after the denial of stay. *Cf. Intermountain Forest Industry Ass'n v. Lyng,* 683 F.Supp. 1330, 1339 (D.Wyo.1988) (The proposed forest plan and accompanying Environmental Impact Statement become final agency action only after approval by the Regional Forester. 36 C.F.R. § 219.10(c)(1), (2). Parties aggrieved by the Regional Forester's opinion may ap-

peal. *Id.* at § 211.18(f)).[18] Finally, since the Forest Service has failed to follow its own interpretation of the statute, the concerns about fair play and orderly procedure noted above would require me to insure that the agency follow its own rules.

For all of the reasons stated, I cannot assume, in the absence of a statutorily required management plan, that the environmental impacts alleged by plaintiff will be excluded from the Wild and Scenic River corridor.[19] Having rejected the Government's position that the timber sale is necessarily outside the area protected by the Act, I now turn to plaintiffs' assertion that the sale will violate the Act.

### C. *Management Responsibilities*

■ As noted *supra,* the management obligations imposed upon the Forest Service pursuant to 16 U.S.C. § 1283(a) are specifically linked to insuring that state-designated rivers will be preserved in accordance with the values in the Wild and Scenic Rivers Act. Despite having had seven years since the designation of the subject river under the Act, defendants have failed to adopt the "management policies, regulations, contracts [and] plans" affecting such lands as may be "necessary to protect such rivers in accordance with the purposes of this chapter." 16 U.S.C. § 1283(a). In light of the compulsory language in section 1283(a), I cannot agree with defendants' position, taken in supplemental briefing, that it was not required to

---

**17.** The quarter-mile *minimum* may refer to the federal guidelines, applicable by their terms to rivers authorized by the Secretary of Interior, indicating that "[t]he study area will cover, as a minimum, an area extending the length of the river segment authorized for study and extending in width one quarter mile from each bank of the river." 47 Fed.Reg. 39456 (September 7, 1962). While this text may simply pertain to the study process, it is noteworthy that the same page indicates that rivers are to be studied "as to their inclusion in the system." *Id.*

**18.** *See* 36 C.F.R. § 211.18(f)(6) ("Decisions at the final level of review constitute the final administrative determination of the Department of Agriculture").

**19.** Even assuming, *arguendo,* that the Forest Service was correct in saying that the corridor limits in 16 U.S.C. §§ 1274(b) and 1275(d) ap-

plied to state-designated rivers, this would not necessarily lead to the conclusion that the area in the timber sale is outside the domain of the Wild and Scenic Rivers Act. Neither provision sets a rigid boundary; rather, they use the quarter-mile figure as an "average" or "general" boundary. The legislative history of the original act indicates a willingness to allow the corridor area to "vary in width at different points along the river segment." H.R.Rep. No. 1623, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News 3801, 3824. The legislative history of section 1275(d), as amended in 1986, uses as its benchmark the same "general" limits that appear in the 1968 legislative history. H.R. Rep. No. 503, 99th Cong., 2d Sess. 11 (1986).

Finally, I note that there is a factual controversy as to whether some of proposed activities will in fact occur *within* a quarter-mile corridor, *see* Plaintiffs' Points and Authorities, Exh. D (addendum to Final EIS, dated October 7, 1988).

implement a management plan. Nor does the court read the statute to mean that the deadline for any such "plan" could remain in limbo for an indefinite period. Such a construction would turn the literal language of the section—"*shall* take such action"—and substitute the language "may take such action" whenever the federal agency is responsible for managing a segment of a state designated river. Moreover, defendants' implicit argument that no constraint operates in the absence of a management plan, coupled with their argument that no time limits exist relative to adopting a plan, contravenes the special concern articulated in § 1283(a) that unrestricted timber harvesting and road construction will defeat the purposes of the Act. Finally, defendants' position contradicts the policy statement of its own guidelines. Federal regulations specifically "delegate[ ] authority" to publish guidelines embodied in the Forest Service Manual and Forest Service Handbook, as supplemented by regional field offices. 36 C.F.R. § 200.4(d)(1), (2). The applicable regional supplement to the Forest Service Manual specifically indicates that "forest supervisors shall prepare and approve an implementation plan for each river area included in the [National Wild & Scenic Rivers Act] by (a) Act of Congress or (b) Secretary of the Interior designation under section 2(a)(ii) of the Act." Plaintiffs' Points and Authorities, Exh. C (Forest Service Manual § 2354.32 (Region Five Supplement, p. 165) (July 1988)). Where, as here, the substantive scope of the Act's protection of the environment may be intimately affected by the character of the implementation plan, it would contravene both the plain meaning of the statute and the agency's own construction of the Act to proceed with the timber sale without adopting the management plan compelled by statute.[20]

### D. *Cooperation Relative to Water Pollution*

As amended in 1986, the Act specifically requires that:

The head of any agency administering a component of the national wild and scenic rivers system shall cooperate with the administrator, Environmental Protection Agency and with the appropriate state water pollution control agencies for the purpose of eliminating or diminishing the pollution of waters of the river.

16 U.S.C. § 1283(c). As expressed in the legislative history, the intent of the 1986 amendment to this section was to clarify that the EPA rather than the Department of the Interior was the principal federal agency responsible for abating water pollution. H.R.Rep. No. 503, 99th Cong., 2d. Sess. 12 (1986). It appears from the record that a genuine factual dispute among qualified scientists exists as to the project's impact on water quality.[21] Although at this stage I cannot, and need not, reach the merits of the factual dispute, I find a significant likelihood from the evidence in the record that the timber sale would degrade environmental quality.

 For purposes of section 1283(c), however, the operative concern is that defendants have apparently failed to cooperate with the pertinent administrative agencies. Plaintiffs have made a sufficient showing, that under any reasonable standard of "cooperation," the approval of the timber sale was undertaken in an uncooperative manner. The Final EIS reveals a number of adverse agency comments pertaining to the water quality consequences of the selected alternative. *See, e.g.,* Letter from Director of California Department of Fish and Game, Final EIS (agency comments following Ch. 5) ("substantially increased erosion in the South Fork drainage, severely impacting the drainage's salmon and steelhead resources for many years to come"). *See also id.,* Comments of Environmental Program Coordinator of California Department of Conservation (recommending Plan 2—reforestation without timber harvest—out of concern over possibility of "catastrophic debris torrents"); Comments of Associate Engineering Geologist

---

**20.** In this regard, defendants' assurances that a management plan is in the process of being adopted simply will not suffice.

**21.** *Compare* Roelofs Declaration, Curry Declaration (deleterious impact) and Ranken Declaration, Haskens Declaration (benign impact).

of California Regional Water Quality Control Board ("much greater impact on water quality than ... the other alternatives"). Moreover, the 1986 Amendment underscored the importance of cooperation with EPA. It is evident that the EPA opposed the project, noting that the Forest Service's preference "does not seem compatible with the analysis presented in the FEIS, especially if these activities increase the potential for mass wasting in sensitive watersheds." Plaintiffs' Points and Authorities, Exh. K (EPA letter, Sept. 22, 1988). The assertion in the Ranken Declaration, p. 17, that EPA approved of the measures (best management practices, or "BMPs") used in the EIS appears conclusory and difficult to credit when read in light of EPA's conclusion, after reviewing the final EIS, that the proposal was inconsistent with the study's own information.[22] Furthermore, it is not apparent why "BMPs," whether or not sufficient for purposes of NEPA, are presumed applicable to the substantive policy embodied in the Wild and Scenic Rivers Act. The Final EIS itself acknowledges public concern that "[t]here is not proof that so-called BMPs either work or are faithfully implemented." Final EIS, V–5. In light of the strong weight of authority opposing the plan outright and the clash of opinion among the experts, I find that defendants' reinterpretation of § 1283(c) as simply requiring "consultation" will not suffice. By suggesting such, defendants are again implicitly converting to a discretionary standard a requirement that is compelled by federal statute.

■ Accordingly, I find a significant likelihood that plaintiffs will prevail on its claim under the Wild and Scenic Rivers Act, based upon a credible risk of environmental degradation upsetting the values protected by the Act and a clear failure by defendants to meet the substantive requirements of the statute.

22. Thus, the EPA's letter noted the agency's belief that "the mitigation measures (Stream Management Zones (SMZs) and Best Management Practices (BMPs)" linked to the plan the

## V

## BALANCE OF HARDSHIPS

As discussed in section II, *supra,* the case at bar is an unusual "hybrid" type of environmental case that does not fit neatly within any standard categories. On the one hand, since the Act requires a threshhold determination that the challenged activity may substantially interfere with the objectives the Act was designed to produce, its relatively flexible review process contraindicates that the statute itself limited this court's ordinary equitable obligation to balance the relative hardships. On the other hand, as discussed in the section IV, *supra,* the Act's compulsory provisions reflect a strong substantive commitment to preservationist values within areas that may be part of Wild and Scenic River corridors, in the event that plaintiffs are able to make the requisite factual showings when the court reaches the merits. While the cause is a "proper one for equitable intervention" rather than one in which the court need not undertake resolution of traditional equitable issues, the balancing of hardships must give effect to the statutory purposes rather than reading them out of existence. *See Parker,* 309 F.Supp. at 601. In balancing the hardships before the court, I recognize that environmental injury is often by its very nature irreparable and must weigh heavily in the balance of hardships. *Save the Yaak,* 840 F.2d at 722; *Gambell,* 480 U.S. at 544, 107 S.Ct. at 1404, 94 L.Ed. 2d at 555. However, this alone cannot be dispositive. The "relative hardships" between the parties thus becomes the "critical element" in deciding whether preliminary injunctive relief is appropriate. *Lopez v. Heckler,* 725 F.2d 1489, 1498 (9th Cir. 1984), *vac'd on other grounds,* 469 U.S. 1082, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984); *see also Benda v. Grand Lodge of International Association of Machinists and Aerospace Workers,* 584 F.2d 308, 314–15 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979).

Forest Service has chosen "may not fully offset potential degradation in the water quality of the South Fork of the Trinity River and its tributaries.") EPA letter, September 22, 1988, *supra.*

**1490**

### A. *Irreparable Injury*

As suggested in section IV, *supra*, plaintiffs have demonstrated a significant likelihood that defendants' failure to implement the procedures required by the Wild and Scenic Rivers Act and their own regulations may result in irreversible environmental degradation. For a discussion of water quality concerns, *see* section IV(D) of this Order. However, the potential environmental damage encompasses a wider range of categories. Although the voluminous evidentiary controversies raised by various conflicting depositions cannot and should not be resolved on the merits at this time, I shall set forth the concerns that have animated my finding of irreparable injury. First, defendants' own final EIS concedes that some measure of environmental degradation will result from implementation of the chosen timber harvest alternative. In various places, the adopted alternative (Plan 5) was found to have more negative environmental impacts than the alternative (Plan 2), which would provide for reforestation efforts without additional timber harvest or road construction.[23] While the EIS made a judgment that, coupled with various "mitigation" measures, the risks could be made acceptable, it is far from clear that this is the balance that is most consistent with the mandatory preservation of the values associated with the Wild and Scenic Rivers Act. The principal objection to Plan 2 appeared to be the projected economic consequences of halting the timber sale.

Serious questions remain as to whether this balance is consistent with the Act's strong commitment to preservationist values discussed in the preceding section.

Further, expert declarations submitted by plaintiffs have raised significant doubts with the court as to whether the various mitigation measures relied upon in the EIS can minimize the adverse environmental impact sufficiently to avoid "substantial interference with public use and enjoyment" of the values underlying the Act, 16 U.S.C. § 1281(a).[24] Defendants and intervenors have introduced counterdeclarations attempting to answer these allegations, and at this preliminary stage, I cannot settle the factual controversy. Nonetheless, where the government has clearly neglected the provisions of the statute and its own interpretations of the governing law, and where at least a significant threat of illegal degradation looms in the balance, I am mindful of the fact that commencement of the timber sale might well do violence to the substantive commitments embodied in federal environmental law.

Since I must consider the relative hardships of the parties, I must make the unwelcome decision of ascertaining who should bear the risk of being wrong. Because the burned timber proposed for sale is a wasting asset subject to decay, a danger exists that if plaintiffs prevail on this motion and prove to be wrong, the economic advantages of the timber sale will be lost, with resulting disadvantages to intervenors, to employees of the timber industry, and to government revenue.[25] Despite

23. *See, e.g., Fish Habitat:* Final EIS at IV–13 (measures under Plan 2 would have favorable impact on fish habitat; in contrast, Plan 5 posed the second highest risk of the alternatives, albeit one judged as "low"); *Geology,* Final EIS at IV–16, 17 (slope stability would be enhanced in Plan 2; in contrast, Plan 5 posed the second highest risk); *Cumulative Impact on Watershed:* Final EIS at IV–36 (acknowledging negative impact with expectation that it could be minimized with mitigation measures); *Recreational Classification:* Final EIS at IV–39 (Plan 5 would change the recreational opportunity classification of the area). *See generally,* IV–57–58 (acknowledging additional sediment production and surface erosion; short term localized erosion before stabilization measures take effect; reclassification out of the "semi-primitive" character of the surroundings; danger to species using hardwood and snag habitats; loss of natu-

ral appearing landscape; and change in visual quality).

24. *See, e.g.,* Roelofs Declaration (mitigation measures will not redress impact of sedimentation and erosion on fish habitat); Reply Declaration of Ferrell (defendants' expert understates environmental consequences of removing woody debris); Reply Declaration of Coats (EIS and defendants' expert underestimated watershed's sensitivity to mass wasting); Franklin Declaration (timber salvage project would "significantly reduce the viability of an already minimally viable Spotted Owl population in northwestern California"); Gutierrez Declaration (emphasizing value of burned timber providing ancillary habitats to the survival of Spotted Owls as forest regenerates).

25. *See, e.g.,* Hammer Declaration, Tomascheki Declaration.

this potential, however, I believe the balance of hardships does not lie with the defendants. First, it is not at all clear that intervenors may assert what would amount to an economic veto over the policy commitments of federal environmental law. *See, e.g., Parker,* 309 F.Supp. at 601. Moreover, because this order comes before a contract has actually been awarded, intervenors' claims are only an expectation, rather than a property right, and such inchoate claims appears less compelling. Clearly, the Government's economic loss cannot be considered compelling if it is to be gained in contravention of federal law. *See, e.g., Northern Cheyenne,* 851 F.2d at 1157 (Secretary of Interior not allowed to consider investments made on the basis of a defective EIS). Third, the economic loss presented by defendants and intervenors represents a gross figure that does not contemplate the substantial federal resource commitments that must be invested in the timber sale and the potential negative economic repercussions that the the sale may produce.[26] Fourth, an unresolved factual dispute exists as to whether halting the timber sale would produce a shortfall.[27] Fifth, defendants' calculations may not have taken into account the significant damage to fishery resources that may result from the timber sale, resulting not only in degradation proscribed by the Wild and Scenic Rivers Act, but also to economic losses to the two fishery groups that are among the plaintiffs.[28] In sum, while I am "not unmindful of the interests and equities" that favor the timber sale, I "cannot give effect to this interest, for the cutting of trees is, as we have noted, too final and conclusive. It must await the processes of law." *Parker,* 309 F.Supp. at 601.

## B. *Public Interest*

While an injunction halting the timber sale is not without risk, it is ultimately necessary to vindicate the commitment to substantive values underlying the Wild and Scenic Rivers Act. 16 U.S.C. §§ 1981(a), 1983(a). I emphasize, however, that this balance of the equities is rooted in the facts at bar and does not constitute an automatic presumption that resource management proceedings must be stayed whenever an allegation is made under the Act. Rather, the decision is based upon a highly specific conjunction of factors. First, the EIS itself acknowledged the possibility of some degradation relative to other alternatives. Second, plaintiff made a sufficient evidentiary showing for this preliminary review to establish a significant likelihood of degrading the specific objectives protected in the WSRA. Third, the most natural reading of the statute suggested that defendants have failed to follow compulsory managerial and planning procedures that must be a prerequisite to the implementation of potentially degrading uses of land resources. Fourth, WSRA specifically warns against potential degradation that a timber sale may create. Fifth, it envisions genuine rather than artificial cooperation between the Forest Service and other agencies responsible for the management of water resources; the court finds it highly instructive that these agencies uniformly opposed the selected alternative. Sixth, defendants' failure to follow their own agency's construction of their statutory obligations created a serious danger to notions of fair play and orderly administration. Seventh, while an injunction against the proposed sale is not without cost or risk,

---

**26.** *See* Final EIS at IV–5 ("The net value of Alternative 5 would be $204,000. Benefit/cost ratio (total value/cost of implementation) would be 1.08/1. The lower net value is considered to be primarily due to high logging costs: 31 percent of the volume would be logged by helicopter.")

**27.** *Compare* Reply Declaration of Schifferle (timber glut already exists); with Tomascheski Declaration (forest failed to meet target volume).

**28.** *See, e.g.,* May Declaration, Bingham Declaration (economic interests of fishermen); Roelofs

Declaration, Curry Declaration, Reply Declaration of Ferrell (timber sale would jeopardize fisheries); *see also* Final EIS at III–5 (fishery "cannot tolerate further degradation of its habitat or diminished numbers"). While fidelity to the WSRA plainly requires more than weighing the economic consequences of a project, the evidence at this preliminary stage has not convinced me that the negative cost to the timber economy from halting the timber sale would exceed cost to the fisheries economy from permitting the timber sale.

preliminary review of the facts suggested that the balance of hardships favored plaintiffs.[29]

## VI

## AMOUNT OF BOND

No preliminary injunction shall issue "except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R. Civ.P. 65(c). it is "well settled that Rule 65(c) gives the court wide discretion in the matter of setting security." *Natural Resources Defense Counsel v. Morton,* 337 F.Supp. 167, 168 (D.D.C.1971), *mot. for summary reversal dismissed,* 458 F.2d 827 (D.C.Cir.1972). *See also Urbain v. Knapp Bros. Mfg. Co.,* 217 F.2d 810, 815–16 (6th Cir.1954); *Doyne v. Saettele,* 112 F.2d 155, 162 (8th Cir.1940). In setting the amount of the bond, I note that all four plaintiff organizations are nonprofit corporations that have brought suit to ensure that the federal government complies with federal environmental laws.[30] Since I have found that plaintiffs have a likelihood of success on the merits, I must also recognize that if these types of groups were "required to post substantial bonds ... in order to secure preliminary injunctions ...," the bonds might undermine mechanisms for private enforcement of environmental law. *Friends of the Earth v. Brinegar,* 518 F.2d 322, 323 (9th Cir.1975) (reducing bond in NEPA case from $4,500,000 to $1,000).

*Accord Morton,* 337 F.Supp. at 169 (bond set at $100); *Environmental Defense Fund v. Corps of Engineers,* 331 F.Supp. 925 (D.D.C.1971) (bond set at $1). While I recognize that the government has a significant economic stake in the proposed timber sale, and that intervenor would also have such a stake if its anticipated contract is in fact awarded, I am nonetheless "unwilling to close the courthouse door in public interest litigation by imposing a burdensome security requirement." *State of Ala. ex rel. Baxley v. Corps of Engineers,* 411 F.Supp. 1261, 1276 (N.D.Ala.1976). Accordingly, bond is set in the amount of One Hundred Dollars ($100).

For the foregoing reasons, IT IS HEREBY ORDERED as follows:

1. Plaintiffs' motion for preliminary injunction is GRANTED, and defendants are enjoined from proceeding with implementing the South Fork Fire Recovery Sale Project, pending further order of the court;

2. Bond is set at One Hundred Dollars ($100).

IT IS SO ORDERED.

---

**29.** *Alpine Lakes Protection Society v. Schlapfer,* 518 F.2d 1089 (9th Cir.1975) does not hold otherwise. Plaintiffs in that case raised concerns regarding compliance with NEPA, "essentially a precedural statute," rather than showing a significant likelihood that the substantive values in the WSRA would be undermined. Moreover, *Alpine Lakes* presented no concern that the Forest Service had failed to comply with its own descriptions of its statutory obligations, and the logging permitted in that case was found to support the public interest in the environment, because it was found necessary to stop insect infestation from spreading to adjacent national

forest land. In contrast, the balancing of equities in the instant case supports fidelity to the WSRA. Finally, there were no countervailing concerns, as there are here, that failure to grant the injunction was likely to endanger an important segment of the local economy.

**30.** Plaintiffs include two national conservation organizations (the Wilderness Society and the Sierra Club), a nonprofit coalition of fishermen's organizations (Pacific Coast Federation of Fishermen's Associations, Inc.), and a nonprofit conservation organization supported by sports fishermen (CalTrout).